UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUDY BAMBERGER,<br><br>                        Plaintiff,<br><br>        v.<br><br>MARSH USA, INC., dba MARSH RISK AND INSRANCE SERVICES, a Corporation; NATIONAL UNION FIRE INSURANCE COMPANY, a Corporation; and DOES 1 through 5, inclusive,<br><br>                        Defendants. | Case No. CV 14-06041- MWF (MANx)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

This matter came on for trial before the Court sitting without a jury on November 3 and November 4, 2015. Following the presentation of evidence and the parties' closing arguments, the matter was taken under submission.

Having carefully reviewed the record and the arguments of counsel, as presented at the trial and in their written submissions, the Court now makes the following findings of fact and reaches the following conclusions of law under Rule 52 of the Federal Rules of Civil Procedure. Any finding of fact that constitutes a conclusion of law is also hereby

adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is also hereby adopted as a finding of fact.

## I. FINDINGS OF FACT

1. Plaintiff Judy Bamberger is an individual and citizen of the State of California.

2. Defendant National Union Fire Insurance Company ("National Union") is a corporation duly organized and existing under the laws of the State of Pennsylvania with its principal place of business in the State of New York.

### A. Judy Bamberger's Employment with Marsh and the Accident

3. From 1997 until 2011, Bamberger was employed as a salesperson with Marsh USA, Inc. ("Marsh") in its office located at 777 South Figueroa, Los Angeles, California.

4. Bamberger's job was to develop new business. Her work required Bamberger to attend off-site meetings with executives and representatives of existing and potential clients, to "cold-call," and to provide educational seminars that often took place at the prospective client's location outside the normal business hours.

5. Bamberger used her personal vehicle to attend off-site meetings and to promote Marsh's business.

6. On the morning of April 15, 2010, Bamberger drove her car to an off-site business function for Marsh. On the way home that evening, Bamberger decided to stop for some frozen yogurt and then attend a 6:00 p.m. yoga class. As she entered the parking lot of the yogurt shop, Bamberger was involved in an automobile accident with Majid Moradi.

### C. Insurance Policies

7. At the time of the accident, Bamberger was covered under two insurance policies that she had personally purchased. Her primary policy was issued by Interinsurance Exchange of the Automobile Club ("AAA") and carried a limit of $100,000. Her umbrella policy—also referred to as an "excess policy"—was issued by

Columbia Casualty Company ("Columbia Casualty"), with a limit of $1,000,000. The excess policy required Bamberger to maintain a limit of $250,000 under her primary policy for bodily injury liability. As a result, Bamberger believed that there was a $150,000 "gap" between her primary and excess policies, for which she was financially responsible.

8. Aside from Bamberger's personal coverage, her employer Marsh was insured under National Union's Business Auto Policy No. CA650-61-84 (the "National Union policy") with a primary limit of $5,000,000 and an excess limit of $50,000,000. Bamberger, as an employee of Marsh, was an "additional insured" under the National Union policy for acts performed within the course and scope of her employment.

### D. The *Moradi* Action

9. On May 26, 2010, Moradi sued Bamberger in Los Angeles County Superior Court (Case No. LC089905) (the "*Moradi* Action"). On September 8, 2010, Moradi amended the complaint to add Marsh as a defendant.

10. Bamberger forwarded the *Moradi* Complaint to AAA and contacted Columbia Casualty, which advised her of the $150,000 gap in coverage.

11. In the *Moradi* Action, Bamberger was represented by her personal counsel Fred Klonsky as well as counsel retained by AAA, Deborah McClain.

12. National Union first learned of the *Moradi* Action on October 6, 2010, after receiving the Initial Notice of Loss from Marsh. Marsh requested and received a defense from National Union against all claims asserted against it.

13. On March 2, 2011, Marsh filed a motion for summary judgment in the *Moradi* Action, contending that it could not be held liable for the accident on the grounds that, at the time of the collision, Bamberger was not acting within the course and scope of her employment but was instead pursuing personal interests. Bamberger opposed the motion.

14. On December 29, 2011, the Superior Court granted Marsh's motion for summary judgment, agreeing that Bamberger's conduct fell outside the scope of her

employment. The Superior Court dismissed Marsh from the *Moradi* Action on January 30, 2012.

15. Moradi—but not Bamberger, appealed the Superior Court's ruling.

16. On September 18, 2012, while the appeal from the summary judgment order was pending, Bamberger entered into a settlement agreement that resolved all claims asserted against her for the total sum of $1,250,000. Bamberger agreed to personally fund the $150,000 gap in monthly installments of $1000.

17. Bamberger did not become aware of the National Union policy until after she met with her counsel in preparation for filing this action. As a result, she did not demand payment of the $150,000 gap from National Union at the time of the *Moradi* settlement.

18. Bamberger did not request any reimbursement or contribution to the *Moradi* settlement from Marsh.

19. On September 17, 2013, the Court of Appeal reversed the Superior Court's summary judgment order. The panel concluded that Bamberger was acting within the scope of her employment at the time of the accident, and that Marsh therefore could be liable for Bamberger's conduct.

20. Marsh filed a Petition for Review (the "Petition") in the California Supreme Court, asserting that the Court of Appeal erred. The Petition was denied on December 18, 2013.

21. It was not until January 2014 that Bamberger's current counsel of record in this action, who assisted in representing Moradi, recognized that Bamberger had potential reimbursement claims against National Union and Marsh.

**E.** **Procedural History of the Present Action**

22. On May 21, 2014, Bamberger filed this action against Marsh and National Union. Bamberger asserted only two claims for relief against National Union: one for breach of contract, and the other for breach of duty of good faith and fair dealing.

23. Bamberger served National Union with the Summons and the Complaint on July 7, 2014. The Complaint notified Defendants that Bamberger had settled the *Moradi* Action for $1,250,000, of which $150,000 constituted her personal funds.

24. Shortly after service of the Complaint, Marsh reimbursed Bamberger for out-of-pocket expenses incurred in the *Moradi* Action, consisting of $21,545 in attorney fees paid to Fred Klonsky (her personal lawyer), $1000 in auto repair expenses, and $99 in car rental fees. Bamberger and Marsh eventually agreed to resolve their dispute without trial under Federal Rule of Civil Procedure 68. (Docket Nos. 154, 158).

25. On August 25, 2014, National Union sent Bamberger's counsel a letter agreeing to reimburse $150,000 that Bamberger personally contributed toward the *Moradi* settlement. The letter informed counsel that Bamberger had not tendered to National Union any claim for defense or indemnity relating to the *Moradi* Action. The letter also reserved National Union's rights under the insurance policy and the law.

26. National Union paid $156,059.98 ($150,000 plus $6,059.98 in interest) to Bamberger by check dated August 30, 2014. Bamberger received and negotiated the check. On March 11, 2015, the Court ruled that this reimbursement rendered Bamberger's breach of contract claim moot. (Docket No. 65).

27. As to Bamberger's bad faith claim, the Court determined that National Union had not breached the implied covenant of good faith and fair dealing prior to the California Supreme Court's denial of the Petition on December 18, 2013. (*Id.*).

28. Bamberger has stipulated, moreover, that National Union's conduct following service of the Complaint on July 7, 2014 does not constitute a breach of the implied covenant of good faith and fair dealing. (Docket No. 158).

29. Consequently, the only remaining issue of liability in this action is whether National Union engaged in bad faith conduct between December 18, 2013 and July 7, 2014.

### F. National Union's Conduct

30. At no time prior to July 7, 2015, did Bamberger tender any claim to National Union, request National Union to defend her in the *Moradi* Action, or demand coverage of the $150,000 gap for which she was personally responsible.

31. In National Union's experience, insureds at times choose not to tender a claim even when faced with liability covered under their policy. Reasons for foregoing coverage include avoiding an increase in insurance premiums and preserving relationships with third-parties by resolving disputes without the insurer's involvement.

32. Only when a claim is tendered does National Union open a claim file and assign a claim adjuster to review the facts, conduct an investigation, determine coverage, and ultimately dispose of the claim.

33. If more than one insured faces potential liability, National Union assigns a separate claim adjuster for each insured to avoid any conflicts of interests that may arise among them.

34. By December 18, 2013, National Union had become aware of Bamberger's settlement with Moradi and her commitment to personally cover the $150,000 gap. But because Bamberger never tendered a claim for reimbursement, National Union focused solely on Moradi's claims against Marsh. As a representative from AIG, Inc.—a claim handling company for National Union—testified, Bamberger was not on National Union's "radar."

35. After the California Supreme Court's ruling, National Union communicated with Bamberger's lawyer, Fred Klonsky, regarding certain discovery issues in the *Moradi* Action. Specifically, National Union sought to take Bamberger's deposition in an effort to resolve Moradi's remaining claims against Marsh. Klonsky never requested reimbursement of the $150,000 gap in any of the communications with National Union.

36. Nor did Bamberger's counsel in this action request indemnification from National Union prior to serving the Complaint. Counsel believed that such a request would be futile.

37. As soon as National Union received notice of this action, it opened a new claim file to address Bamberger's allegations, assigned a claim adjuster to determine coverage, and fully reimbursed Bamberger shortly thereafter.

38. National Union never denied coverage for the $150,000 gap.

39. Based on these facts, the Court FINDS that National Union did not violate the implied covenant of good faith and fair dealing.

## II. **CONCLUSIONS OF LAW**

1. To prevail on a claim for breach of implied covenant of good faith and fair dealing, the plaintiff must establish that "(1) benefits due under the policy [were] withheld; and (2) the reason for withholding benefits [was] unreasonable or without proper cause." *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1151, 271 Cal. Rptr. 246 (1990).

2. A breach of an insurance contract alone does not render the insurer's conduct unreasonable. *See Griffin Dewatering Corp. v. N. Ins. Co. of New York*, 176 Cal. App. 4th 172, 194, 97 Cal. Rptr. 3d 568 (2009) ("[A] breach of an insurance contract does not automatically subject an insurer to tort damages for bad faith breach."). A showing of "bad judgment or negligence" is insufficient to establish bad faith; instead, the evidence must a show that the insurer engaged in a "conscious and deliberate act, which unfairly frustrate[d] the agreed common purposes and disappoint[ed] the reasonable expectations of the [insured]." *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 90 Cal. App. 4th 335, 346, 108 Cal. Rptr. 2d 776 (2001); *Nieto v. Blue Shield of California Life & Health Ins. Co.*, 181 Cal. App. 4th 60, 86, 103 Cal. Rptr. 3d 906 (2010) ("[B]reach of the implied covenant of good faith and fair dealing involves something beyond breach of the contractual duty itself, and it has been held that bad faith implies unfair dealing rather than mistaken judgment.") (internal quotations and citation marks omitted).

3. In determining whether the insurer acted in bad faith, the trier of fact considers the totality of the circumstances, not isolated incidents. *See Walbrook Ins. Co.*

*v. Liberty Mut. Ins. Co.*, 5 Cal. App. 4th 1445, 7 Cal. Rptr. 2d 513 (1992) ("The litmus of good faith/bad faith is to be tested against the background of the totality of the circumstances in which the insurer's disputed actions occurred. The trier of fact undertakes a wide-ranging inquiry into such intangibles as motive, knowledge, experience, and the ability to prophesy."). The circumstances must be examined as they existed at the time of the insurer's conduct without regard to facts discovered at a later juncture. *Filippo Indus., Inc. v. Sun Ins. Co. of New York*, 74 Cal. App. 4th 1429, 1441, 88 Cal. Rptr. 2d 881 (1999).

### A. **Implied Covenant of Good Faith**

4. The Court presumes, as did the parties during trial, that National Union withheld benefits that were rightfully due to Bamberger until August 30, 2014. The sole remaining issue is whether National Union acted in bad faith by failing to reimburse Bamberger between December 18, 2013 and July 7, 2014.

5. In arguing that National Union's actions constitute a deliberate effort to withhold benefits, Bamberger relies primarily on the decision of the California Supreme Court in *Sarchett v. Blue Shield of California*, 43 Cal. 3d 1, 233, Cal. Rptr. 76 (1987). The insured there was hospitalized for three days due to his rapidly-deteriorating health. *Id.* at 4. His insurer, Blue Shield, paid all medical and diagnostic testing bills but denied the reimbursement claim for the hospital stay. *Id.* The insured, his physician, and the hospital repeatedly protested the denial of coverage. *Id.* Blue Shield refused to alter its coverage determination and failed to advise the insured of his contractual right to impartial review and arbitration. *Id.* Only after six months of back-and-forth correspondence between the parties did Blue Shield mention the possibility of peer review. *Id.* at 4-5. And even then, Blue Shield conditioned its offer to submit the dispute to an independent panel on the production of "solid" information in support of the insured's claim, even though the insured's contractual right to impartial review contained no conditions whatsoever. *Id.* at 5.

6. The trial court directed verdict in favor of the insured on his claim for breach of the implied covenant of good faith and fair dealing. *Id.* The court based its ruling in part on Blue Shield's failure to advise the insured of his contractual rights. *Id.* The California Supreme Court agreed. *Id.* at 14. The Supreme Court underscored the unique relationship between and the insured and the insurer, and reasoned that "in situations in which an insured's lack of knowledge may potentially result in a loss of benefits or a forfeiture of rights, an insurer [is] required to bring to the insured's attention relevant information as to enable the insured to take action to secure rights afforded by the policy." *Id.* (internal quotation marks and citations omitted). The Supreme Court further reasoned that once "it becomes clear to the insurer that its insured disputes its denial of coverage . . . the duty of good faith does not permit the insurer passively to assume that its insured is aware of his rights under the policy. The insurer must instead take affirmative steps to make sure that the insured is informed of his remedial rights." *Id.* at 15. The court concluded that Blue Shield's conduct was "designed to mislead subscribers into forfeiting the contractual right to impartial review" and therefore constituted a breach of the implied covenant of good faith and fair dealing. *Id.*

7. To state the facts and reasoning of *Sarchett* is to show just how different the case is from this action. Unlike the insured in *Sarchett*, Bamberger never tendered any claim to National Union and had been dismissed from the *Moradi* Action for over a year by the time the Petition was denied on December 18, 2015. And while the insured in *Sarchett* corresponded with Blue Shield specifically about claim denial, Bamberger's counsel did not mention any claim for reimbursement during his communications with National Union. Indeed, National Union never even denied Bamberger's claim for benefits and covered the $150,000 gap without any protest as soon as it received notice of this lawsuit. Comparing National Union's silence with that of Blue Shield in *Sarchett* is comparing apples and oranges.

8. That is not to imply that National Union's conduct was entirely justified. By December 18, 2015, National Union knew that (1) Bamberger settled the *Moradi* Action

-9-

using $150,000 of her personal funds; (2) Bamberger was an "additional insured" under National Union's policy for acts performed in the course and scope of her employment with Marsh; and (3) Bamberger's conduct at the time of the accident was judicially determined to have been within the scope of her employment. Consistent with the principles expressed in *Sarchett*, it was a mistake for the National Union to remain silent and "passively assume that its insured is aware of his rights under the policy." *Sarchett*, 43 Cal. 3d at 15.

9. But a mistake alone does not constitute bad faith. As the parties and the Court repeatedly recognized, the facts of this action are unique, with no analogous case law to guide National Union. After the California Supreme Court denied Marsh's Petition, all actors in the *Moradi* litigation were focused solely on the dispute between Marsh and Moradi. Bamberger had long settled her claims and was considered important only in her role as a percipient witness. Only Bamberger's current counsel recognized the existence of a potential claim for benefits under the National Union policy, and even he did not inform National Union of Bamberger's claim until this action.

10. National Union, moreover, had strong incentives to pay Bamberger. In light of the large liability claim facing Marsh, National Union would have certainly benefited by expeditiously reimbursing the primary witness in the case. And, in fact, National Union did so shortly after being notified of Bamberger's claim. National Union's simply did not commit a "conscious and deliberate act" to frustrate Bamberger's contractual rights.

11. Accordingly, National Union did not breach the implied covenant of good faith and fair dealing.

### B. **Damages**

12. Because Bamberger failed to present evidence establishing National Union's liability, the Court does not reach the issue of damages, including *Brandt* fees.

### III. <u>VERDICT</u>

The Court **FINDS** and **RULES** that National Union did not breach the implied covenant of good faith and fair dealing. Accordingly, the Court's verdict is in favor of Defendant National Union.

The Court will enter a separate judgment pursuant to Federal Rules of Civil Procedure 54 and 58(b).

Dated: January 22, 2016

*[signature]*

MICHAEL W. FITZGERALD
United States District Judge